**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| | : | |
| THE TECHNOLOGY DEVELOPMENT | : | CIVIL ACTION NO. 05-4282 (MLC) |
| COMPANY, LTD., et al., | : | |
| | : | **MEMORANDUM OPINION** |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| MICHAEL ONISCHENKO, | : | |
| | : | |
| Defendant. | : | |
| | : | |

**COOPER, District Judge**

Plaintiffs, The Technology Development Company, Ltd.,
("TTDC"), TTDC BIO US LLC, and TTDC BIO US LP, brought this
action against the defendant, Michael Onischenko ("Onischenko").
(Dkt. entry no. 21, Am. Compl.)[1]  TTDC asserts claims against
Onischenko for, <u>inter alia</u>, (1) breach of contract, (2) breach of
fiduciary duty, (3) tortious interference with contract and
prospective economic advantage, (4) conversion and theft, and (5)
legal malpractice.  (<u>Id.</u> at 13-29.)  Onischenko asserts
counterclaims for (1) breach of contract, (2) unjust enrichment,
and (3) promissory estoppel.  (Dkt. entry no. 40, Ans. &
Countercl. at 19-21.)

---

[1] Plaintiffs move to voluntarily dismiss TTDC BIO US LLC and
TTDC BIO US LP from the action, pursuant to Federal Rule of Civil
Procedure ("Rule") 41(a)(2).  (Dkt. entry no. 98, Mot. Dismiss.)
Onischenko does not oppose the motion.  (Dkt. entry no. 120,
Onischenko Opp'n Br. at 1 n.2.)  The Court will grant the motion
to dismiss these parties, leaving TTDC as the sole plaintiff.

TTDC moves for partial summary judgment (the "Motion") in its favor, with respect to (1) its claims for (a) breach of fiduciary duty and (b) legal malpractice, and (2) Onischenko's counterclaims for (a) breach of contract and (b) breach of implied contract/ promissory estoppel.  (Dkt. entry no. 99, Mot.) Onischenko cross-moves to dismiss (the "Cross Motion") TTDC's breach of fiduciary duty and legal malpractice claims.  (Dkt. entry no. 100, Cross Mot.)  As Onischenko has presented matters outside the pleadings in support of the Cross Motion, the Court treats the Cross Motion as one for summary judgment. Fed.R.Civ.P. 12(d).

The Court held oral argument on the motions.  (See dkt. entry nos. 141, 142.)  For the reasons stated herein, the Court will deny the Motion, and grant in part and deny in part the Cross Motion.

## BACKGROUND

### I.    The Parties

TTDC is a Bermuda company with its principal place of business in Boise, Idaho.  (Am. Compl. at ¶ 2.)[2]  Thomas De Shazo

---

[2] Prior to 2006, TTDC maintained its principal place of business in Moscow, Russia.  (Answer & Countercl. at ¶ 162; see also undocketed 5th De Shazo Decl. at ¶ 4 (stating that "[a]lthough the office of the plaintiff was located in Moscow, Russia, from mid-2004 onward essentially all of the development work . . . took place in Stockholm, Sweden."); dkt. entry no. 103, 4th De Shazo Decl., Ex. 102, Onischenko Aff. Supp. Modifying Order, at ¶ 2 (stating that TTDC's operations relocated to Boise, Idaho, sometime after Onischenko's resignation).)

("De Shazo") is the founder, president, and chairman of the Board of Directors of TTDC. (Dkt. entry no. 99, Pl. Stmt. Facts at ¶ 1.) Onischenko allegedly served as legal counsel to TTDC from 1999 to 2005 as well as being vice president and a member of the Board of Directors during the same period. (Am. Compl. at ¶ 8; Ans. & Countercl. at ¶ 8; but see 4th De Shazo Decl., Ex. 107, Onischenko Dep. at 79:11-16 (stating that his response to paragraph 8 "is a mistake"); Onischenko Dep. at 82:7-8 ("One of my roles at TTDC was legal counsel.").) Onischenko is a member of the New York bar, and maintains a residence in New Jersey. (Am. Compl. at ¶ 5; Ans. & Countercl. at ¶¶ 5, 166; dkt. entry no. 5-1, 9-20-05 Onischenko Decl. at ¶ 2.)

De Shazo is a businessman who first met Onischenko in 1997, while Onischenko was managing the Moscow office of a large international law firm. (9-20-05 Onischenko Decl. at ¶ 4; Pl. Stmt. Facts at ¶ 5.) Onischenko was recruited by De Shazo in May 1999 to work for De Shazo's "group of companies" in Russia. (Ans. & Countercl. at ¶ 169; 9-20-05 Onischenko Decl. at ¶ 5; Pl. Stmt. Facts at ¶ 6.) De Shazo's business interests included, inter alia, a Moscow Hugo Boss store and the company holding the real estate on which it was located, ZAO Foton; a Russian software company; and an "oil exploration company that had privatized Kazakhstan's oil fields" called Ecolo. (9-20-05 Onischenko Decl. at ¶ 4.)

## II.  TTDC's Dealings With Onischenko and Others

The parties dispute the validity and significance of various contracts alleged to exist relating to the parties' rights and obligations as to the work being done by TTDC, the result being that both parties assert a cause of action for breach of contract, albeit with respect to different contracts.  The Court has attempted to summarize the various alleged contracts and points of conflict below.

### A.    Onischenko's Alleged Employment Contract With TTDC

Onischenko asserts that in July 1999, "De Shazo and his then-partner Phillip Hirschler offered [Onischenko] 10% of the equity, profits and distribution from Mr. De Shazo's group of companies in addition to a salary of $15,000 per month, as well as 1% of Ecolo."  (Id. at ¶ 5; see also Ans. & Countercl. at ¶ 169; dkt. entry no. 130, 1-14-10 Onischenko Decl. at ¶ 3; accord Onischenko Dep. at 43:5-11.)  It is undisputed that Onischenko "started work for . . . De Shazo's companies in July, 1999." (Pl. Stmt. Facts at ¶¶ 8, 11; Onischenko Dep. at 30:16-21 (stating that he went to work for Hirschler and De Shazo around July 7, 1999).)  De Shazo asserts that "[w]hen TTDC was formed in 1999, Mr. Onischenko became one of its directors and its Vice President and Legal Counsel, responsible for overseeing TTDC's legal affairs as an attorney and performing duties related to TTDC's business."  (Dkt. entry no. 3, 1st De Shazo Decl. at ¶ 3.)

4

According to De Shazo, Onischenko was paid "total salary and
bonus of $1,289,000 by TTDC" from July 1999 through June 30,
2005, for his work.  (<u>Id.</u>)

Onischenko represents that he "accepted Mr. De Shazo's
offer" to work for him, and drafted an agreement memorializing
the terms of the offer and Onischenko's acceptance thereof, which
neither De Shazo nor his then-partner ever signed despite
Onischenko asking them several times to do so in October 1999.
(9-20-05 Onischenko Decl. at ¶¶ 5-9; Onischenko Dep. at 45:18-
48:9 (indicating that De Shazo and/or Hirschler were reluctant to
sign draft agreement prepared by Onischenko due to various
conflicts with partners in the "group of companies"); 4th De
Shazo Decl., Ex. 121, 10-22-99 Email from Onischenko to De Shazo
and Hirschler, Bates No. TTDC2847 (requesting De Shazo and
Hirschler to sign draft agreement prepared by Onischenko in July
1999 and indicating that Onischenko had not been receiving his
salary on a consistent or predictable basis).)  Onischenko
contests TTDC's contention that Onischenko served as legal
counsel and denies that he was "TTDC's 'lawyer.'"  (Dkt. entry
no. 121, 1-5-10 Onischenko Decl. at ¶ 6; <u>but see</u> Onischenko Dep.
at 82:7-8 (stating that one of his roles at TTDC was legal
counsel).)  In support of this position, Onischenko argues that
(1) the business card De Shazo had made for Onischenko includes
his name, contact information in Russia, and the name TTDC, but

does not in any way suggest that he is counsel or a legal advisor
to TTDC; and (2) the TTDC website listed Onischenko as vice
president, and made no mention of him being legal counsel.  (1-
14-10 Onischenko Decl. at ¶¶ 5-6 & Ex. A, Business Card; but see
Pl. Stmt. Facts at ¶ 21 ("Defendant Onischenko's business card
shows that he was acting as 'Legal Counsel' for Plaintiff."); 4th
De Shazo Decl., Ex. 157, Business Card.)  Onischenko also
contended at his deposition that he "did not work for TTDC,"
because he "never got a paycheck saying TTDC."  (Onischenko Dep.
at 84:14-21; cf. Onischenko Dep. at 176:3-4 ("Mr. De Shazo
stopped paying me any kind of salary on May 1, 2003.");
Onischenko Dep. at 250:14-15 ("Mr. De Shazo stopped paying my
salary March 1, 2003.").)

> **B.   Formation of TTDC and Recruitment of Dr. Sabetsky**

TTDC was formed sometime after Onischenko began working for
De Shazo's group of companies in order to commercialize and
develop biotechnologies; the parties both alternately state that
TTDC was formed in "mid-2000" or "in and around September 1999."
(Pl. Stmt. Facts at ¶ 19 ("TTDC came into being in mid-2000")
(citing Onischenko deposition testimony); Am. Compl. at ¶ 8
("TTDC was founded in and around September 1999"); Ans. &
Countercl. at ¶ 8 (admitting ¶ 8 of the Amended Complaint); 9-20-
05 Onischenko Decl. at ¶ 13 (stating his "first work with TTDC
came almost immediately after [he] accepted Mr. De Shazo's offer

of employment"); Onischenko Dep. at 44:1-3 ("TTDC came into being in mid September 2000, about a year and a half" after Onischenko was recruited; <u>see</u> 4th De Shazo Decl., Ex. 125, TTDC Cert. of Incorporation dated 9-15-00; Onischenko Dep. at 81:13-19 (stating that there was an "obvious error" in paragraph 8 of the Amended Complaint and corresponding answer, "because TTDC was not founded in September 1999.  TTDC was founded in September 2000.").)

Onischenko first met Dr. Vladimir Sabetsky ("Sabetsky"), a prominent Russian biotechnology expert, in October 2000.  (9-20-05 Onischenko Decl. at ¶ 14.)  Onischenko successfully recruited Sabetsky to join TTDC in May 2002.  (<u>Id.</u>; Pl. Stmt. Facts at ¶¶ 56-57.)  From that time until Sabetsky's resignation on July 29, 2005, TTDC and Sabetsky worked on a project (the "project") "for the development and commercialization of technologies for oral delivery of insulin and gene cell therapies."  (Pl. Stmt. Facts at ¶ 58.)

## C.    Alleged Contract Regarding Onischenko's Interest in Holding Company

Onischenko contends that "[e]arly in 1999," De Shazo encouraged Onischenko to undertake a business trip at his own expense by assuring him that he "was to have a 35% interest in the TTDC holding company ('TTDCBio') that would be formed to develop Russian pharmaceutical technology."  (9-20-05 Onischenko Decl. at ¶ 13; Pl. Stmt. Facts at ¶ 63; Onischenko Dep. at 65:17-

66:16.)[3]  Onischenko also asserts that he discussed his 35%
interest in the TTDC holding company with De Shazo immediately
before Sabetsky executed his agreement to join TTDC, in light of
the fact that such holding company would need to be set up to
develop Sabetsky's work, but De Shazo (1) expressed an apparent
intention to renege, and (2) instead offered Onischenko a "25%
interest [in the holding company] plus the first $10,000,000 in
licensing fees earned by TTDC."  (9-20-05 Onischenko Decl. at ¶
15.)

An email sent from Onischenko to De Shazo on July 1, 2005,
the effective date of Onischenko's resignation, states, "for six
years now you have been avoiding the issue of my equity ownership
although you made numerous constantly fluctuating promises. . . .

---

[3] Onischenko recounted De Shazo's offer of 35% of the "bio
business" as follows at his deposition:

> I remember specifically that discussion with Mr. De
> Shazo.  We were standing on the banks of the Moscow
> River in front of Hotel Katiff, and I was refusing to
> go to Novosibirsk to meet with Vector because I was
> sick and tired of spending my own money funding his
> businesses, first funding his family's trip to Boise,
> then funding the trip that he asked me to go to because
> ISTC [International Science and Technology Center] was
> sponsoring at Novosibirsk speak and Vector, because
> they had no money.

> So he said, why are you getting so excited? You're
> going to be getting 35 percent of this company.  Okay?
> And I said, well, let me think about it.  And he said,
> well, think fast because the flight leaves tonight.  I
> think it was like a Tuesday at the end of August 1999.

(Onischenko Dep. at 65:20-66:16.)

Normally managed companies and projects have all of this worked
out prior to their start-up." (4th De Shazo Decl., Vol. 5,
Onischenko RFP # 125, 7-1-05 Email from Onischenko to De Shazo.)

    **D.   Sabetsky's Agreements With TTDC**

    TTDC asserts that it entered into two agreements with
Sabetsky, both effective May 1, 2002. (1st De Shazo Decl. at ¶
10.) One agreement provided for the creation of a holding
company "to hold the intellectual property rights and/or the
shares of legal entities that may be established to implement and
conduct the business relating to the technologies" invented or
that may be invented by Sabetsky relating to, <u>inter</u> <u>alia</u>, gene
and cell therapies. (<u>Id.</u> & Ex. 2, 5-1-02 Agreement.) This
agreement provided that TTDC would own 75% of the holding company
to be formed, while Sabetsky would own 25%. (5-1-02 Agreement at
1, ¶ 2(i).) The agreement is signed by Onischenko as a Director
of TTDC and Sabetsky. (<u>Id.</u> at 5.) The second agreement, titled
"Consultancy/Proprietary Information/Invention Agreement,"
obliges Sabetsky to hold proprietary information in confidence
and assigns Sabetsky's proprietary rights in his inventions to
the holding company to be established pursuant to the 5-1-02
Agreement. (1st De Shazo Decl., Ex. 3, Consultancy Agreement.)
Like the 5-1-02 Agreement, the Consultancy Agreement was executed
by Onischenko on behalf of TTDC and by Sabetsky.

TTDC contends that pursuant to the agreement between TTDC and Sabetsky, which was drafted by Onischenko and executed by TTDC and Sabetsky to be effective May 1, 2002, and provided for the creation of a "holding company" to hold the intellectual property rights to Sabetsky's inventions, "TTDC was to own 75% and Dr. Sabetsky was to own 25% of the shares of this holding company," such that no provision was made for Onischenko to have any ownership in the holding company, notwithstanding that the agreement called for Onischenko to serve as the "initial Chairman" of the holding company.  (Pl. Stmt. Facts at ¶¶ 59-61; 5-1-02 Agreement at 2, ¶ 3(ii).)

### E.   Confidentiality and Non-Circumvention Agreement

TTDC bases its breach of contract and breach of fiduciary duty claims against Onischenko on a "Confidentiality and Non-Circumvention Agreement" ("CNA") that De Shazo directed Onischenko to prepare "for the purpose of protecting the assets of TTDC to be entered into by all employees and consultants." (Am. Compl. at ¶¶ 57-71 & Ex. A, CNA; Pl. Stmt. Facts at ¶ 48; 1st De Shazo Decl. at ¶ 4.)  The CNA is dated October 11, 2001, and was signed by De Shazo as a Director of TTDC and by Onischenko.

The CNA provides that Onischenko is to (1) use TTDC's proprietary information only as directed by TTDC; (2) participate in the development and commercialization of TTDC's proprietary

technologies only on TTDC's behalf and at its express
instruction; and (3) return or destroy any documents relating to
TTDC after the termination of any relationship with TTDC.  (CNA
at 1.)  It further prohibits Onischenko from using TTDC's
information to negotiate with, work with, or work for third
parties to compete with TTDC.  (Id. at 2.)

     Onischenko admits that he signed the CNA.  (Ans. &
Countercl. at ¶ 10.)  However, Onischenko contends that "De Shazo
used the fact that he owed [Onischenko] over $1,000,000 to force
[Onischenko] to sign the" CNA, such that Onischenko believed that
the CNA was (1) extorted from him, and (2) unreasonable and
unconscionable in its terms.  (1-14-10 Onischenko Decl. at ¶ 4;
9-20-05 Onischenko Decl. at ¶ 10; Onischenko Dep. at 93:5-7
("[The CNA] was an extortion attempt by . . . De Shazo, to hold
back monies he owed me unless I signed it.").)[4]  Onischenko also
denies that he prepared the CNA, stating that De Shazo provided
an example of such an agreement and gave it to TTDC's in-house

_____

     [4] Onischenko's claim that De Shazo owed him money apparently
stems from Onischenko's successful negotiation of the sale of De
Shazo's interest in Ecolo.  (9-20-05 Onischenko Decl. at ¶ 6.)
Onischenko states that (1) De Shazo had agreed to pay Onischenko
$250,000 if he successfully "'extricated' Mr. De Shazo from his
remaining minority position in Ecolo"; (2) he negotiated the sale
of De Shazo's interest in Ecolo for $3.6 million; (3) Onischenko
should have received $1.15 million from that sale; (4) De Shazo
"used the fact that he owed [Onischenko] over $1,000,000 to force
[Onischenko] to sign" the CNA by refusing to pay him unless he
signed the CNA; and (5) despite Onischenko's signing the CNA, De
Shazo never paid what he owed to Onischenko.  (Id. at ¶ 10.)

attorney, Anna Vigdorchick, to review and prepare.  (Onischenko
Dep. at 92:2-20.)  Onischenko also states that he told De Shazo
that in his view, the CNA was unenforceable because the non-
compete period provided for was too long and there was a lack of
consideration.  (Onischenko Dep. at 140:25-141:21.)

## III. Decline of Relationship Between TTDC/De Shazo and Onischenko

Onischenko managed the project on behalf of TTDC and worked
closely with Sabetsky in doing so.  (Pl. Stmt. Facts at ¶ 68.)
In 2002, Sabetsky and Onischenko worked together in drafting
patents covering the technology TTDC sought to commercialize.
(9-20-05 Onischenko Decl. at ¶ 16.)  Eventually, however,
Onischenko and De Shazo began to disagree, inter alia, over both
the ownership of the holding company and the direction of the
project.  Onischenko accuses De Shazo of financially starving
TTDC and alienating potential investors and research partners.
(Id. at ¶¶ 11, 17-24.)  TTDC attributes its difficulties to
Onischenko's leadership.  (Pl. Stmt. Facts at ¶¶ 71-82, 105-107.)
TTDC alleges that Onischenko breached his fiduciary duties to
TTDC "by engaging in conduct that was and remains in conflict
with and detrimental to TTDC's interests, by intentionally
interfering in TTDC's contractual relationships with Dr.
Sabetsky, and by urging and inducing Dr. Sabetsky to breach or
fail to perform his obligations under the May 1, 2002
Agreements."  (Am. Compl. at ¶ 67.)

## IV.  Sale of ZAO Foton Building

Onischenko asserts that as of August 2004, "all of TTDC's senior management" other than Sabetsky and himself had resigned because their salaries were not being paid.  (9-20-05 Onischenko Decl. at ¶ 26.)  According to Onischenko, by December 2004, TTDC's contracts with suppliers, laboratories, and employees had gone unpaid, and "the company was well over $3,000,000 in debt." (Id. at ¶ 28.)  At this point, "the only hope of income for TTDC was the sale of the ZAO Foton property formerly occupied by the Hugo Boss store."  (Id. at ¶ 29.)[5]

"ZAO Foton was a Russian corporate entity that held the real estate on which the Hugo Boss store that was operated" by another of De Shazo's companies stood.  (1-5-10 Onischenko Decl. at ¶ 9.) ZAO Foton sold that real estate in February 2005, and the proceeds were used "to pay off back salaries, severance pay, and other critical TTDC expenses."  (Pl. Stmt. Facts at ¶ 121; 9-20-05 Onischenko Decl. at ¶ 29 (stating that "when the property was finally sold in February 2005," Onischenko "used the proceeds to pay off back salaries, severance pay, and other critical TTDC expenses, obligations of TTDC that Mr. De Shazo berated [him] for

---

[5] TTDC contends, however, that as of June 2005, Onischenko was stating that TTDC's debts were paid, TTDC was not in the red, and TTDC had funds available.  (Pl. Stmt. Facts at ¶¶ 232-236; see 4th De Shazo Decl., Ex. 72, 6-28-05 Email from Onischenko to Amanda De Shazo (stating TTDC had cash assets of $646,000 and liabilities of $170,000).)

not fulfilling").)  The property was sold for $4.17 million, and
while some of the sale price was received by wire transfer in ZAO
Foton's bank account, "the balance was received in cash which was
entrusted to . . . Onischenko" and placed by Onischenko in a safe
deposit box.  (4th De Shazo Decl. at ¶¶ 19-21.)  De Shazo states
that the cash from the sale was intended "specifically to pay [De
Shazo's] personal obligations, obligations of [his] various
companies, TTDC's salaries and operating overhead, and to fund
the continued operations and TTDC's drug research and development
program then being carried out in Stockholm, Sweden."  (4th De
Shazo Decl. at ¶ 22.)

        Onischenko states that De Shazo "stripped out of TTDC over
$1,000,000 of the proceeds of the ZAO Foton sale," which he used
to buy a house, cars, and a sailboat, in April and May of 2005.
(9-20-05 Onischenko Decl. at ¶ 30.)  TTDC asserts that the
proceeds from the ZAO Foton sale were (1) not TTDC funds; (2) put
in a safety deposit box in the names of (a) Vigdorchick, (b)
Onischenko, and (c) De Shazo; and (3) intended for TTDC's use.
(Pl. Stmt. Facts at ¶¶ 123-124, 129.)  TTDC further states that
as of June 2, 2005, there was "$240,000 of Mr. De Shazo's money"
in that safety deposition box, to which Onischenko had the key;
TTDC "asked Onischenko for the key to the safe-deposit box to
fund TTDC's oral insulin project and operate its office";
Onischenko refused to provide the key to TTDC, allegedly telling

Vigdorchick "essentially that he was keeping the money because
Mr. De Shazo owed it to him and she should not anticipate seeing
any of this cash"; and Onischenko "caused to be wired to himself
approximately $250,000 of the funds that were loaned to TTDC."
(Id. at ¶¶ 127-130; 1st De Shazo Decl. at ¶¶ 37-39; 4th De Shazo
Decl., Ex. 16, 7-14-05 Email from Onischenko to Vigdorchick.)
TTDC asserts that Onischenko admitted at his deposition that he
"took over $200,000 and put it into an account with 'one of his
partners' after he and Sabetsky left and set up a company."  (Pl.
Stmt. Facts at ¶ 131; see Onischenko Dep. at 177:6-178:18
(stating that Onischenko used this money to pay his lawyers in
this litigation, to pay for Sabetsky's apartment and feed his
family, and to settle contractual debts incurred by the drug
trials in Sweden).)  De Shazo did not authorize Onischenko's
appropriation of these funds.  (4th De Shazo Decl. at ¶ 25;
Onischenko Dep. at 179:1-2 ("Why would I need his authorization?
It's my money.").)[6]

## V.   Onischenko's Resignation from TTDC/De Shazo's Group of Companies

Onischenko resigned from TTDC at De Shazo's direction on
July 2, 2005.  (See Pl. Stmt. Facts at ¶ 144; 4th De Shazo Decl.,
Ex. 5, 7-2-05 Email from Onischenko to De Shazo.)  An email sent

---

[6] Onischenko denies that he took anything from TTDC that did
not belong to him.  (1-5-10 Onischenko Decl. at ¶ 19.)  TTDC's
claims for (1) conversion and theft and (2) unjust enrichment are
not at issue in the current Motion or Cross Motion.

from Onischenko to De Shazo the following day states, "Effective as of July 1, 2005, I hereby resign all positions in legal entities owned and controlled by Thomas A. De Shazo."  (4th De Shazo Decl., Ex. 6, 7-3-05 Email.)

De Shazo, Onischenko, and Sabetsky met in Russia on July 29, 2005, to try to resolve some of their differences; TTDC asserts that Onischenko "announced his intention to claim ownership of the" project for himself, and offered De Shazo 5% of the royalties of such project, which De Shazo rejected.  (Pl. Stmt. Facts at ¶ 161.)  Sabetsky resigned from TTDC immediately thereafter, and demanded the return of his intellectual property, refusing to work with De Shazo.  (Id. at ¶¶ 162, 165; 9-20-05 Onischenko Decl. at ¶ 31; 4th De Shazo Decl., Ex. 9, 7-5-05 Email from Onischenko to Sabetsky (advising, "Do not sign anything until breach of contract is resolved" in response to request from Alston & Bird for Sabetsky to execute power of attorney forms).)

## VI.  Parties' Claims at Issue in Motion and Cross Motion

TTDC seeks judgment in its favor as to its breach of fiduciary duty and legal malpractice claims.  Onischenko seeks judgment in his favor with respect to TTDC's breach of fiduciary duty and legal malpractice claims, and opposes a grant of summary judgment to TTDC with respect to his breach of contract counterclaims.  Onischenko asserts that "all of the activities related to Plaintiff's claims for Breach of Fiduciary Duty and

16

Legal Malpractice took place outside of the United States," he did not act as an attorney at law with respect to those activities, and finally that he did nothing contrary to TTDC's interests.  (1-5-10 Onischenko Decl. at ¶ 20.)

### A.   TTDC's Breach of Fiduciary Duty Claim

TTDC alleges that Onischenko "violated the CNA and breached his fiduciary duties to TTDC" by, inter alia, intentionally interfering with TTDC's contractual relationships with Sabetsky and its patent counsel, Alston & Bird; misappropriating, misusing, and disclosing TTDC's proprietary information "for his own interest and to intentionally deprive TTDC of prospective economic advantage"; and by misappropriating the $240,000 cash that TTDC represents was entrusted to him to meet TTDC's operating expenses.  (Am. Compl. at ¶¶ 67-69.)  Specifically, De Shazo accuses Onischenko of: (1) removing all files and business documents from TTDC's Moscow office; (2) misappropriating TTDC's operating funds; (3) casting TTDC in a bad light to Sabetsky and others, inducing Sabetsky to breach his agreements with TTDC and others not to do business with it; (4) telling an attorney at Alston & Bird that De Shazo would not pay the firm's legal fees for patent work done on behalf of TTDC; and (5) directing Sabetsky not to sign an Assignment From Inventor form required as part of TTDC's patent application filings.  (1st De Shazo Decl. at ¶¶ 33-42; see also Pl. Stmt. Facts at ¶¶ 155-165.)

17

According to TTDC, Onischenko went into business with
Sabetsky and other consultants and contacts who had previously
been working on the project of commercializing a drug delivery
system with TTDC.  (Pl. Stmt. Facts at ¶¶ 166-173.)  Onischenko,
however, states that while he did incorporate a company in New
Jersey in mid-July, 2005, after he resigned from TTDC, "that New
Jersey company was never active in any sort of business dealings,"
only ever issued stock to Onischenko, and lost its "active
status" in February 2008.  (1-14-10 Onischenko Decl. at ¶ 7.)

**B.   TTDC's Legal Malpractice Claims**

TTDC asserts three separate claims for legal malpractice
against Onischenko, predicated upon his alleged negligence,
breach of confidentiality, and misappropriation of funds and
property, respectively.  The legal malpractice claims are
asserted as arising under New York law and the Code of
Professional Responsibility governing the conduct of New York
attorneys.  (Am. Compl. at ¶¶ 105-114.)

Onischenko denies that he ever served as either De Shazo's
personal legal advisor or a legal advisor to TTDC "in connections
with the circumstances that TTDC alleges constitutes a violation
of TTDC's rights."  (1-5-10 Onischenko Decl. at ¶ 6.)  Rather,
Onischenko contends he served as vice president of TTDC, not its
lawyer.  (Id.; see also id. at ¶ 14 (stating that while
Onischenko "did undertake certain activities . . . that

18

benefitted Mr. De Shazo, such as the sale of his interest in
Ecolo, [he] did that . . . pursuant to a very specific and
explicit power of attorney . . . to be the business person to
negotiate the terms of the deal . . . as attorney-in-fact, not as
an attorney-at-law.").)

### C.   Onischenko's Counterclaims

Onischenko asserts counterclaims for both breach of his
employment compensation agreement entitling him to a salary and a
portion of the distributions of De Shazo's group of companies, as
well as the alleged agreement that he would receive 35% of the
interest in the holding company contemplated by De Shazo and
Onischenko after recruiting Sabetsky to hold TTDC's intellectual
property.  (Ans. & Countercl. at ¶¶ 187-190, 196-200.)  TTDC
contends that Onischenko has received all the compensation owed
to him.  (Pl. Stmt. Facts at ¶¶ 174-183.)  TTDC further contends
that Onischenko received what was owed to him in association with
the sale of De Shazo's interest in Ecolo, specifically, $50,000
in legal fees, and was not contractually entitled to the 1% share
Onischenko claims he had in Ecolo such that he should have
received a share of the proceeds of the sale.  (Id. at ¶¶ 191-
210; Onischenko Dep. at 125:17-21 (stating that De Shazo paid
Onischenko $50,000 in legal fees for his work on the
transaction); 4th De Shazo Decl., Ex. 24, Bates No. TTDC95,
Professional Sales Invoice dated 9-30-01 (charging legal fees of

$50,000.00 re: "Ecolo Divestiture"); id., Exs. 28-31 (records showing wire transfers for legal fees in Ecolo matter).)

Onischenko's promissory estoppel counterclaim is predicated on Onischenko's forgoing other employment opportunities in order to expend "time and effort on TTDC's behalf for nearly six years." (Ans. & Countercl. at ¶ 198.)  TTDC seeks judgment in its favor on both Onischenko's breach of contract and breach of implied contract/promissory estoppel counterclaims in its Motion. The Cross Motion does not address these counterclaims, but Onischenko opposes the Motion.  (Onischenko Opp'n Br. at 4-7 & n. 7 (noting that Onischenko did not move for summary judgment with respect to his contract claims because he presumed factual disputes would exist).)

The parties currently do not seek judgment in their favor on Onischenko's counterclaim for unjust enrichment.

## DISCUSSION

### I.   Summary Judgment Standard

The standard for a motion for summary judgment is well-settled and will be briefly summarized here.  Rule 56 provides that summary judgment is proper if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a).  In making this determination, the Court must "view[] the record in the light most favorable to the non-moving party and draw[] all inferences

20

in that party's favor." <u>United States ex rel. Josenske v.</u>
<u>Carlisle HMA, Inc.</u>, 554 F.3d 88, 94 (3d Cir. 2009) (citing
<u>Abramson v. William Patterson Coll.</u>, 260 F.3d 265, 276 (3d Cir.
2001)).  If the Court determines, upon review of a motion and a
cross motion for summary judgment, that no genuine issue of
material fact exists, "judgment may be entered in favor of the
deserving party in light of the law and undisputed facts." <u>City</u>
<u>of Millville v. Rock</u>, No. 07-1073, 2010 WL 199618, at *5 (D.N.J.
Jan. 12, 2010).

## II.  Legal Standard Applied to Motion and Cross Motion

The Court, having converted Onischenko's motion to dismiss
to one for summary judgment, considers the four claims at issue
in the Motion and Cross Motion in terms of whether, under the
summary judgment standard, judgment may be entered in favor of
either party on any claim.

### A.    TTDC's Breach of Fiduciary Duty Claim

TTDC contends that Onischenko, as a director and officer of
TTDC, owed TTDC fiduciary duties of good faith and loyalty.
(Dkt. entry no. 99, TTDC Br. Supp. Summ. J. at 28.)  As the
factual basis for this claim, TTDC asserts that Onischenko
transferred TTDC funds without authorization and advised Sabetsky
"not to execute the assignments that he was obligated by contract
to make." (<u>Id.</u>)  Onischenko points out that the allegedly
misappropriated funds were the proceeds of the sale of property

belonging to another company, not TTDC, such that TTDC is not the
real party in interest with respect to the breach of fiduciary
duty claim.  (Dkt. entry no. 119, Onischenko Br. Supp. Cross Mot.
at 2, 5.)

Onischenko, in support of the Cross Motion, contends that
Russian decisional law governs the substantive elements of TTDC's
claims.  (Dkt. entry no. 119, Onischenko Br. Supp. Cross Mot. at
7.)  He contends that Russian law "does not recognize the concept
of fiduciary duty between a company officer and the company," and
"duties under company law apply only to members of the board of
directors and members of the company's executive organ." (Id. at
8-9 (citing Black et al., Legal Liability of Directors and
Company Officials, 2007 Colum. Bus. L. Rev. 614, 628 (2007)).)[7]

### 1.   Choice of Law

Onischenko accurately notes that in a diversity case such as
this, the Court must apply the choice of law rules of the forum
state, New Jersey, in determining what substantive law to apply.
(Id. at 7 (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S.

---

[7] We find no support in the record for Onischenko's bald
assertion that he was merely "employed by TTDC . . . while
performing his duties as Vice President of TTDC" and was not a
director of TTDC, such that TTDC's breach of fiduciary duty
claims must be dismissed.  (Onischenko Br. Supp. Cross Mot. at 8,
10 & n.7.)  TTDC's 2005 Certificate of Incumbency lists
Onischenko as both a director and an officer (Vice President).
(4th De Shazo Decl., Ex. 125 (enclosing documents purporting to
show that TTDC "is an operating entity and that Mr. Onischenko is
a Director of TTDC as of May 2005," including Certificate of
Incumbency).)

487, 496 (1941)).)  Onischenko then sets forth the "governmental
interest analysis" to resolving choice of law questions in New
Jersey.  (Id.)  We therefore must advise the parties that fairly
recently, but before the Motion and Cross Motion were filed, "the
Supreme Court of New Jersey retired the traditional flexible
governmental interest test and instead, endorsed the most
significant relationship test to decide the choice-of-law
question in claims that sound in tort."  Ghaffari v. Hern, No.
06-931, 2009 WL 2147092, at *3 (D.N.J. July 15, 2009) (citing
P.V. v. Camp Jaycee, 197 N.J. 132 (2008)).  "Following Camp
Jaycee, the Appellate Division recognized that the 'most
significant relationship' test has effectively replaced the
'governmental interest' test as the guiding principle of New
Jersey's choice-of-law analysis.'"   Id. at *4.  This test
consists of two prongs:  first, a determination of whether an
actual conflict exists as among the potentially applicable laws;
and second, if a conflict exists, a weighing of the factors
enumerated in the Restatement section corresponding to the cause
of action.  Id.

     Onischenko proceeds to undertake a governmental-interests
analysis between Russian and New York law governing fiduciary
duties.  (Onischenko Br. Supp. Cross Mot. at 8-11.)  We find that
this analysis not only applies the wrong choice-of-law standard,
but also fails to take into account the potential applicability

of Bermuda law, insofar as Bermuda is TTDC's place of incorporation.  (See id. at 11 & n. 8 ("TTDC, a Bermuda Corporation, is the only remaining Plaintiff.").)  Furthermore, while the Court understands that Onischenko addresses the possibility that New York law governs TTDC's legal malpractice claims because TTDC relies on that argument, we find absolutely no indication that New York has any kind of a significant relationship to the breach of fiduciary duty claim.

## 2. Internal Affairs Doctrine

Because the parties did not address the potential applicability of Bermuda law to the breach of fiduciary duty claim, the Court briefly does so here.  The Third Circuit observed in 2005 that "[u]nder New Jersey's choice-of-law rules, the law of the state of incorporation governs internal corporate affairs."  Fagin v. Gilmartin, 432 F.3d 276, 282 (3d Cir. 2005).  "The internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs--matters peculiar to the relationships among or between the corporation and its current offices, directors, and shareholders--because otherwise a corporation could be faced with conflicting demands."  Edgar v. MITE Corp., 457 U.S. 624, 645 (1981) (citing Restatement (Second) of Conflict of Laws § 302 cmt. b (1971)).

While the internal affairs doctrine does not necessarily require automatic application of Bermuda law to the claim at hand, neither is it inconsistent with New Jersey's "most significant relationship" approach to choice-of-law questions. See Restatement (Second) of Conflict of Laws § 302(2) ("The local law of the state of incorporation will be applied to determine [issues involving the rights and liabilities of a corporation], except in the unusual case where, with respect to the particular issue, some other state has a more significant relationship to the occurrence and the parties in which event the local law of the other state will be applied."); compare id., cmt. a (defining the "internal affairs" of a corporation as "the relations inter se of the corporation, its shareholders, directors, officers, or agents") with Restatement (Second) of Conflicts of Laws § 301 (pertaining to "rights and liabilities with respect to a third person that arise from a corporate act"); Restatement (Second) of Conflict of Laws § 309 ("The local law of the state of incorporation will be applied to determine the existence and extent of a director's or officer's liability to the corporation . . . except where, with respect to the particular issue, some other state law has a more significant relationship under the

principles stated in § 6 to the parties and the transaction, in which event the local law of the other state will be applied.").[8]

It appears that in this case, both the factual bases for the breach of fiduciary duty claims - the alleged misappropriation of the proceeds of the sale of the ZAO Foton building, and Onischenko's alleged interference with TTDC's relationship with Sabetsky - involve dealings with third parties, as opposed to presenting "issues of organic structure or internal administration" of TTDC. Tyco Int'l, Ltd. v. Kozlowski, 756 F.Supp.2d 553, 561 (S.D.N.Y. 2010); see also Palladin Partners v. Gaon, No. 05-3305, 2006 WL 2460650, at *17 (D.N.J. Aug. 22, 2006)

---

[8] Section 6 of the Restatement (Second) of Conflict of Laws states:

   (1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

   (2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include

      (a) the needs of the interstate and international systems,
      (b) the relevant policies of the forum,
      (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
      (d) the protection of justified expectations,
      (e) the basic policies underlying the particular field of law,
      (f) certainty, predictability and uniformity of result, and
      (g) ease in the determination and application of the law to be applied.

(noting that "breach of fiduciary duty claims are typically subject to the internal affairs doctrine" but distinguishing claims at issue as "brought by creditors not by officers, directors, or shareholders" and therefore not subject to the internal affairs doctrine).  Therefore, the internal affairs doctrine does not apply to this claim.  We further note that the section 6 factors may not favor application of Bermuda law, insofar as that jurisdiction has little connection to this claim with the exception of TTDC being incorporated there and TTDC having a bank account there.  See Intarome Fragrance & Flavor Corp. v. Zarkades, No. 07-873, 2009 WL 931036, at *13-14 (D.N.J. Mar. 30, 2009) (observing that "the default law to be applied to . . . claims of breach of fiduciary duty" was Delaware as the state of incorporation, proceeding to consider whether the "section 6 principles" dictated that another state had a more significant relationship with respect to the particular issue, and concluding that New Jersey's interests were insufficient to outweigh the internal affairs doctrine).

### 3.  Court's Ruling on Breach of Fiduciary Duty Claim

The Court cannot grant judgment in favor of either TTDC or Onischenko on TTDC's breach of fiduciary duty claim at this juncture.  TTDC has failed to make any argument as to what law applies (beyond suggesting that New Jersey agency law applies) or conduct any choice-of-law analysis, and thus cannot show that "as

a matter of law" it is entitled to judgment in its favor. (TTDC Br. Supp. Summ. J. at 28-29.)  Moreover, the facts upon which it bases its claim are disputed by Onischenko.  (<u>See, e.g.,</u> 1-5-10 Onischenko Decl. at ¶¶ 8-12, 16-20; 9-20-05 Onischenko Decl. at ¶¶ 29-31; 1-14-10 Onischenko Decl. at ¶ 7.)[9]

Onischenko's brief in support of the Cross Motion conducts a choice of law analysis between New York and Russian law, albeit an outdated one, but it is clear that the factual predicate on which Onischenko rests his contention why he should be awarded summary judgment on the breach of fiduciary duty claim – that he was not a director of TTDC and Russian law does not impose fiduciary duties on officers – is, at a minimum, in dispute,

---

[9] Summary judgment in favor of Onischenko on this claim would be inappropriate, insofar as his legal argument that the ZAO Foton proceeds did not belong to TTDC such that TTDC is not the real party in interest as to Onischenko's alleged misappropriation of those funds, conflicts with his statements that those proceeds were contemplated by the relevant persons as intended for use by TTDC, including that "[a]s discussed by Mr. De Shazo and [fellow TTDC director Todd Nalven]," by mid-December 2004, "the only hope of income for TTDC was the sale of the ZAO Foton property," which, when sold, Onischenko used the proceeds to pay off "critical TTDC expenses."  (<u>See</u> Onischenko Br. Supp. Cross Mot. at 5-7; 9-20-05 Onischenko Decl. at ¶¶ 28-29; Onischenko Dep. at 175:7-9 ("Q: [T]he money [proceeds of the ZAO Foton sale] was never in TTDC, was it?  A: Yes, it was."); Onischenko Dep. at 179:10-180:23 (explaining that ZAO Foton proceeds ended up in a mixture of TTDC bank accounts in Bermuda and Moscow, De Shazo's personal accounts, and being "used to pay a couple of personal loans that Mr. De Shazo had."); 4th De Shazo Decl., Ex. 102, Onischenko Aff. Supp. Modifying Order at ¶¶ 12-16 (discussing disposition of ZAO Foton proceeds); <u>cf.</u> TTDC Br. Supp. Summ. J. at 19 ("De Shazo was forced by circumstances to sell his major asset [ZAO Foton building] and <u>loan the proceeds</u> to the Plaintiff.") (emphasis added).)

insofar as TTDC has submitted exhibits in support of its Motion including TTDC's incorporation paperwork and Certificate of Incumbency, both of which list Onischenko as both a director and vice president.  See supra n.7.

Accordingly, both the Motion and the Cross Motion will be denied with respect to TTDC's breach of fiduciary duty claim.

**B.   TTDC's Legal Malpractice Claims**

TTDC "seeks partial summary judgment that . . . Onischenko violated the standards of care applicable in the State of New York by failing to disclose conflicts of interest, failing to obtain a waiver of said conflicts, misappropriating client funds, and engaging in dishonest or deceitful conduct."  (TTDC Br. Supp. Summ. J. at 20; see also dkt. entry no. 122, TTDC Reply Br. Supp. Summ. J. at 9-10.)  In support of its Motion, TTDC offers the expert testimony of Hal Lieberman, which opines that Onischenko entered an attorney-client relationship with De Shazo in July 1999, agreed to be legal counsel to TTDC in September 1999, and subsequently violated ethics principles set forth in (1) "DR [Disciplinary Rule] 5-104(A)" of the New York Code of Professional Responsibility regarding "transactions between lawyer and client"; (2) "DR 9-102(A)" of the same, regarding "a lawyer's duty not to misappropriate client funds or property"; and (3) "DR 1-102(A)" of the same, which sets forth "the standard of care of a reasonable lawyer seeking to conform his conduct to

the requirements of the Code, and his fiduciary duty as a lawyer." (Dkt. entry no. 54, Lieberman Decl. at ¶¶ 27-32, 39-46; TTDC Br. Supp. Summ. J. at 22-27.)[10]

TTDC, as with its breach of fiduciary duty claim, has not provided any choice-of-law analysis as to its legal malpractice claims, but contends that New York law applies because (1) the CNA provides that the obligations of the parties be "construed and interpreted based upon the laws of the United States," and (2) Onischenko "knew that TTDC, [sic] president Thomas Arthur De Shazo was relying on his legal expertise as a licensed attorney in New York to provide him with sound, ethically advice [sic]." (Dkt. entry no. 115, TTDC Br. Opp'n Cross Mot. at 35; see also TTDC Reply Br. Supp. Summ. J. at 11 (conflating discussion of proof of a jurisdiction's substantive law with conflict of law analysis).)

Onischenko has conducted a choice-of-law analysis and contends that Russian law governs this claim, but has not made a meaningful showing of what that law is, beyond stating that "Russia does not recognize the tort of legal malpractice." (Onischenko Br. Supp. Cross Mot. at 7-11; dkt. entry no. 108, Onischenko Stmt. Facts at ¶ 2 (citing Creditanstalt Inv. Bank AG

_____

[10] Paragraph 47 of the Lieberman Declaration summarizes Onischenko's ethical violations as the following: conflict of interest, failure to maintain client confidences and secrets, misappropriation of client funds and property, and engaging in dishonest or deceitful conduct. (Lieberman Decl. at ¶ 47.)

v. Chadbourne & Parke LLP, 778 N.Y.S.2d 863, 866 (N.Y. Sup. Ct. 2004)); dkt. entry no. 129, Onischenko Reply Br. Supp. Cross Mot. at 7-8 (distinguishing Creditanstalt on basis that defendant, New York-based law firm with offices in Russia, had a "substantial nexus" to New York not present in this case).)[11]  TTDC does not dispute that the tort of legal malpractice does not exist in Russian law.  (TTDC Br. Opp'n Cross Mot. at 34 (arguing that "it would make very little sense for this Court to apply Russian law, which provides no cause of action for legal malpractice or breach of fiduciary duty . . . if there is no remedy available").)

Onischenko further argues that even if New York law did apply to the legal malpractice claims, "these claims should nevertheless be dismissed . . . because under the application of New York law, New York would decline to adjudicate the controversy."  (Onischenko Br. Supp. Cross Mot. at 9.)  Because the parties agree that TTDC's legal malpractice claims cannot be maintained under Russian law, we examine the merits of claim, assuming, without finding, that New York law applies. Specifically, we consider the validity of TTDC's presumption that

---

[11] Creditanstalt addressed a motion to dismiss on the basis of forum non conveniens, an issue that has already been resolved with respect to this action.  See Onischenko v. The Tech. Dev. Co., Ltd., 174 Fed.Appx. 117 (3d Cir. 2006) (vacating order dismissing complaint on forum non conveniens grounds and remanding for reconsideration); Onischenko v. The Tech. Dev. Co., Ltd., 536 F.Supp.2d 511 (D.N.J. 2007) (denying Onischenko's motion to dismiss on the grounds of forum non conveniens).

because Onischenko gave TTDC and De Shazo legal advice and may
have publicly held himself out as TTDC's "Legal Counsel," he was
necessarily "practicing law in Russia in Russia under a New York
license," despite lacking "authority to practice as an attorney
under Russian law," such that he is subject to civil suit in New
Jersey, for legal malpractice allegedly committed in Russia,
under New York law.  (See TTDC Br. Opp'n Cross Mot. at 25-26,
31.)[12]

### 1.   Legal Malpractice Under New York Law

TTDC offers no explanation for its assumption that because
it and De Shazo sought legal advice from Onischenko in part
because Onischenko was a member of the New York bar, Onischenko's
conduct and ethical obligations in Russia are governed by New
York's Code of Professional Responsibility Disciplinary Rules.
(See TTDC Br. Opp'n Cross Mot. at 33, 35.)  Cf. Bank Brussels
Lambert v. Credit Lyonnais (Suisse), 220 F.Supp.2d 283, 285
(S.D.N.Y. 2002) ("Attorney conduct in New York is governed by the
Code of Professional Responsibility Disciplinary Rules.")
(emphasis added).  Neither party directed the Court to case law
holding an expatriate attorney living and working in Russia to

---

[12] We also note that TTDC's equation of violation of ethical
rules, as attested to by Mr. Lieberman, with a civil claim for
legal malpractice, lacks a valid legal basis.  (See Onischenko
Opp'n Br. at 7-8.)  Tabner v. Drake, 780 N.Y.S.2d 85, 89 (N.Y.
App. Div. 2004) (observing that violation of a disciplinary rule
does not in and of itself amount to actionable negligence on the
part of an attorney).

the ethical standards imposed and enforced by the state bar where
the attorney was at one time licensed, and the Court's
independent research uncovered no such authority.

Onischenko relies primarily on a pair of cases in which
federal courts sitting in New York declined to exercise personal
jurisdiction over attorneys whose actions all occurred outside of
New York. (Onischenko Br. Supp. Cross Mot. at 12 (citing Lipin
v. Hunt, 538 F.Supp.2d 590 (S.D.N.Y. 2008) and BHC Interim
Funding, LP v. Bracewell & Patterson, LLP, No. 02-4695, 2003 WL
21467544, at *8 (S.D.N.Y. June 19, 2002)).) Although we accept
Onischenko's contention that "the cases . . . demonstrate that
simply being admitted to a state's bar does not in and of itself
create an interest sufficient enough to create personal
jurisdiction," they are not helpful to this Court's determination
of whether TTDC's legal malpractice claims may go forward,
insofar as personal jurisdiction over Onischenko is not at issue
in this action. (Id. at 13.)[13]

An examination of the elements of a legal malpractice claim
under New York law elucidates why TTDC's claim cannot survive

_____

[13] Lipin does not involve a malpractice claim. The Court in
BHC Interim Funding, in transferring the action to Texas for lack
of personal jurisdiction over a Texas-based law firm, did not
address any substantive choice of law issues or specify the
particular basis for the plaintiff's claim against the law firm.
See BHC Interim Funding, LP, 2003 WL 21467544, at *1 (stating
that plaintiff alleged it was defrauded into providing financing
based on an opinion delivered by the law firm that misrepresented
the ownership of its client's stock).

summary judgment, given the facts in this case.  TTDC must show
"(1) that the defendant attorney failed to exercise that degree
of care, skill, and diligence commonly possessed by a member of
the legal community, (2) that the attorney's conduct was the
proximate cause of the loss sustained, (3) that the plaintiff
sustained damages as a direct result of the attorney's actions,
and (4) that the plaintiff would have been successful in the
underlying action had the attorney exercised due care."  Dimond
v. Kazmierczuk & McGrath, 790 N.Y.S.2d 219, 220 (N.Y. App. Div.
2005).  TTDC has made no showing whatsoever as to the first
element, and the Court therefore must ask:  by which legal
community's standard of care is Onischenko's conduct to be
relatively assessed?  Expatriate New York-licensed attorneys
living in Russia, providing advice to a corporation with its
principal place of business in Russia?  Attorneys providing advice
in Russia generally?  The Court finds no basis on the factual
record to hold Onischenko to the standard of care for New York-
licensed attorneys practicing in New York, since he did not do so.

TTDC has not alleged or proven the fourth element of legal
malpractice, either.  The allegations in support of the legal
malpractice claims make clear that there was no "underlying
action" as to which TTDC could make the required showing that it
"would have been successful."  For instance, TTDC takes issue
with the fact that Onischenko now claims the CNA is unenforceable,

notwithstanding that he prepared it for TTDC to use to protect its intellectual property as to "approximately thirty five (35) employees and consultants, including Attorney Onischenko, and approximately one hundred twenty-five (125) third parties." (Am. Compl. at ¶¶ 109-110, 113-116.)  However, TTDC makes absolutely no allegation that it has tried and failed to enforce the CNA as to anyone other than Onischenko himself.  (See id. at ¶¶ 118-123.)  Nor does TTDC allege even the specter of any other "underlying action" in which TTDC would have been successful but for Onischenko's alleged legal malpractice.  (See id. at ¶¶ 125-141.)  Because TTDC cannot establish the elements of legal malpractice under New York law, nor could the claim be maintained under Russian law, we find that Onischenko is entitled to judgment in his favor on these claims.

### 2.  Redundancy of Legal Malpractice Claims

The record does not support TTDC's position that Onischenko was "practicing law" in the manner contemplated by the New York Code of Professional Responsibility, as opposed to serving essentially as an in-house attorney to TTDC and De Shazo's "group of companies" in Russia in conjunction with his duties as a director and officer of TTDC.[14]  Onischenko does not appear to

---

[14] Any legal representation by Onischenko of De Shazo or his "group of companies" is irrelevant for purposes of the legal malpractice claims, which are brought solely by the remaining plaintiff in this action, TTDC.

have been "practicing law" in Russia, and there is no dispute
that he was not "practicing law" in New York.

Negotiating and drafting contracts, even the CNA relied upon
by TTDC, does not require a law license generally or,
specifically in this instance, that Onischenko be admitted to the
New York bar.  The type of advice De Shazo claims he relied upon
from Onischenko is consistent with Onischenko's role as vice
president of TTDC and/or an employee of De Shazo or De Shazo's
"group of companies."  (See, e.g., TTDC Br. Opp'n Cross Mot. at
31-33.)  Quite simply, TTDC's legal malpractice claims are
entirely redundant to its breach of fiduciary duty claims, which
are properly asserted against Onischenko as a director and
officer of TTDC, and are subject to dismissal on that basis.  Cf.
Weil, Gotshal & Manges, LLP v. Fashion Boutique of Short Hills,
Inc., 780 N.Y.S.2d 593, 596 (N.Y. App. Div. 2004) (reinstating
legal malpractice claim by client against law firm and dismissing
breach of fiduciary duty claim as redundant).

### C.   Onischenko's Breach of Contract Counterclaims

#### 1.   Choice of Law

Neither party addresses that there may be a question as to
what jurisdiction's law applies to Onischenko's breach of
contract and breach of implied contract/promissory estoppel
counterclaims.  (See Onischenko Opp'n Br. at 4 (citing no law but
setting forth elements of breach of contract under New Jersey

law); TTDC Br. Supp. Summ. J. at 4 (setting forth elements of
breach of contract under New Jersey law).)   The parties do not
dispute that for Onischenko to succeed on his breach of contract
counterclaim under New Jersey law, he must prove that (1) a
contract existed between Onischenko and TTDC; (2) Onischenko
fulfilled his obligations under the contract; (3) TTDC breached
its duties under the contract; and (4) Onischenko was harmed by
TTDC's breach.   (Id.)

     The Court directs the parties to the following description
of the New Jersey choice-of-law procedure for contract disputes:

> In making a choice-of-law determination in a breach-of-
> contract case, New Jersey courts ask which forum has
> the most significant relationship with the parties and
> the contract.   To that end, the New Jersey Supreme
> Court has adopted the principles set forth in § 188 and
> § 6 of the Restatement (Second) of Conflicts of Laws.
> Section 188 directs courts to consider, among other
> things:
>
> (a) the place of contracting, (b) the place of
> negotiation of the contract, (c) the place of
> performance, (d) the location of the subject matter of
> the contract, and (e) the domicil, residence,
> nationality, place of incorporation, and place of
> business of the parties.
>
> Section 6 lists the following nonexclusive factors
> relevant to a choice-of-law analysis:
>
> (a) the needs of the interstate and international
> systems, (b) the relevant policies of the forum, (c)
> the relevant policies of other interested states and
> the relative interests of those states in the
> determination of the particular issue, (d) the
> protection of justified expectations, (e) the basic
> policies underlying the particular field of law, (f)

certainty, predictability and uniformity of result, and
(g) ease in the determination and application of the
law to be applied.

Forestal Guarani S.A. v. Daros Int'l, Inc., 613 F.3d 395, 401 (3d
Cir. 2010) (internal citations omitted).

The Court intends to deny the Motion insofar as it seeks
judgment in TTDC's favor on Onischenko's breach of contract
counterclaims on the grounds that (1) the parties have not
adequately demonstrated what jurisdiction's law applies, and (2)
if New Jersey law were to apply, as the parties assume, it is
evident that material factual disputes as to the existence,
terms, and conditions of the alleged contract(s), as set forth
above, preclude summary judgment.  Because Russia was apparently
the place of contracting, negotiation, performance, and subject
matter of the alleged contract, with some performance also
apparently occurring in Sweden and TTDC's place of incorporation
being Bermuda, the Court further intends to order the parties to
show cause why Russian law should not apply.  The parties'
responses to the Order to Show Cause should address the factors
listed in both the Restatement (Second) of Conflicts of Laws §
188(2) and § 6(2), listed above.  This will necessarily involve a
showing by the parties, particularly Onischenko as the proponent
of the breach of contract counterclaims, as to the relevant
Russian law covering breach of contract.

38

### 2. Promoters and Corporations' Liability for Pre-Incorporation Contracts

The Court, although intending to deny the Motion insofar as it seeks judgment in TTDC's favor on Onischenko's breach of contract counterclaims, is nonetheless compelled to address the substance of TTDC's argument as to this claim. TTDC is misguided in its argument that because Onischenko claims to have entered into an agreement with De Shazo and Hirschler to work for De Shazo's "group of companies" and TTDC "did not come into existence as an entity separate and apart from Mr. De Shazo until . . . September 14, 2000," Onischenko as a matter of law cannot be considered to have had "an oral contract with the Plaintiff," TTDC. (TTDC Br. Supp. Summ. J. at 6, 9 (emphasis in original); see also dkt. entry no. 140, TTDC Reply Br. Supp. Mot. Strike at 2 (arguing that because Onischenko contends the contract he seeks to enforce was formed on August 31, 1999, but admits that TTDC was not formed until September 2000, this "essentially sink's [sic] his claim that plaintiff TTDC breached the alleged contract which he made with Mr. De Shazo on August 31, 1999.").) TTDC cites no law in support of this argument. (Id.)

Russian law, as noted previously, may apply to Onischenko's counterclaims for breach of contract; it is unclear at this juncture. However, TTDC ignores the concept of a corporation's liability for contracts entered into by a promoter prior to incorporation insofar as it contends that "De Shazo could not

39

have been acting upon the behalf of [TTDC] in promising to give Defendant Onischenko 35% of a then non-existent company, even if such a promise had been made."  (Id. at 9.)  See generally 1A Fletcher Cyclopedia of the Law of Corporations § 211 ("Generally, an express adoption or ratification is not required in order to bind the corporation; however, the corporation will be bound where the act or conduct of those who would have authority to bind it in the first instance is such that an adoption or ratification must necessarily be implied.  Additionally, if promoters enter into a contract for the corporation's benefit with the understanding, express or implied, that the corporation will adopt and perform on the contract, and with knowledge of the contract, the corporation accepts its benefits, it is bound both in law and in equity to perform the obligations that the contract imposes.").

Insofar as Onischenko alleges he entered into the contracts with De Shazo, who is the very person who ultimately, in addition to Onischenko himself, was authorized to conduct business on behalf of TTDC by virtue as his position as a director and officer, the Court sees no reason why, under the common law of corporations, the fact that TTDC did not yet exist at the time the contracts were allegedly entered into necessarily nullifies Onischenko's breach of contract claims against it.  See, e.g., In re Quality Shoe Shop, 212 F. 321, 324 (E.D. Pa. 1914) (holding

40

that promoter of yet-to-be-incorporated corporation, acting as an agent of the corporation on the verge of being formed, "no doubt . . . intended to bind the corporation" and was therefore acting in its behalf); Berman v. Gurwicz, 458 A.2d 1311, 1321 (N.J. Super. Ct. 1981) ("The adoption of a pre-incorporation agreement may be evidenced by action of the corporation after it is formed; it need not be accomplished by a formal resolution of the board of directors."); K & J Clayton Holding Corp. v. Keuffel & Esser Co., 272 A.2d 565, 566 (N.J. Super. Ct. 1971) ("In the context of a promoter having executed the contract, the corporation later coming into existence, the corporation is entitled to all the rights thereunder as well as assuming full liability therefor."); id. at 567-69 (stating "the question is not whether mutuality [of the remedy of specific performance] existed at the time of the contract; it is enough that there is mutuality at the time of the decree or judgment" and rejecting defendant's attempt to avoid a contract on the basis that "if defendant had attempted to enforce the contract against the plaintiff before the latter's incorporation, it could not have done so") (emphasis added).

The Court thereby advises TTDC that if it intends to pursue this line of argument in the future, it should not do so without addressing (1) applicable law, and (2) the liability of a corporation formed subsequent to the contract at issue, entered into by a promoter, without the need for a formal adoption of the contract.

41

## III. Motion to Strike

    After the parties completed briefing the Motion and Cross
Motion, TTDC moved to strike paragraph 4 of Onischenko's 1-14-10
Declaration (dkt. entry no. 130) and certain "conclusory
allegations contained in paragraphs 5, 7, and 15 of" Onischenko's
1-5-10 Declaration (dkt. entry no. 121).  (Dkt. entry no. 136,
Mot. to Strike & Br. Supp. Mot. Strike.)  The substance of the
portions of the declarations TTDC seeks to strike relate to the
alleged terms of the purported contract Onischenko seeks to
enforce against TTDC.  TTDC contends the 1-14-10 Onischenko
Declaration was (1) not timely filed, and (2) filed solely for
the purpose of disputing material facts.  (Br. Supp. Mot. Strike
at 3.)  TTDC asserts that the specified portions of the 1-5-10
Onischenko Declaration should be struck because they are "clearly
conclusory."  (Id. at 8.)

    We observe that both parties submitted various "corrected"
documents over the course of the briefing period and generally
engaged in other creative electronic filing methods.  The Court
is not compelled to grant the relief sought by TTDC under Rule
56.  In the interests of justice, and in light of having
converted Onischenko's Cross Motion to one for summary judgment,
the Court declines to strike the specified portions of
Onischenko's declarations.  See Fed.R.Civ.P. 12(d) (stating that
if a motion to dismiss is treated as one for summary judgment,

42

the parties "must be given a reasonable opportunity to present all material that is pertinent to the motion").  TTDC will have an opportunity to use those documents in cross-examination at trial.  We will therefore deny the motion to strike.

### CONCLUSION

The Court, for the reasons stated _supra_, will (1) grant the motion to voluntarily dismiss certain plaintiffs, (2) deny the Motion, (3) grant in part and deny in part the Cross Motion, and (4) deny the motion to strike.  The Court will issue an appropriate order.


                                    _____s/ Mary L. Cooper_____
                                    **MARY L. COOPER**
                                    United States District Judge

Dated: December 23, 2011